AF Approval ~~~~~                                    Chief Approval RBH for QR

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 6:20-cr-165

AVINASH SINGH

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by

Maria Chapa Lopez, United States Attorney for the Middle District of

Florida, and the defendant, AVINASH SINGH, and the attorney for the

defendant, Michael Salnick, Esquire, mutually agree as follows:

A.  **Particularized Terms**

1.  Counts Pleading To

The defendant shall enter a plea of guilty to Counts One through

Four of the Information.  Counts One and Two charge the defendant with

wire fraud, in violation of 18 U.S.C. § 1343.  Counts Three and Four charge

the defendant with money laundering, in violation of 18 U.S.C. § 1957.

2.  Maximum Penalties

Counts One and Two each carry a maximum sentence of 20

years' imprisonment, a fine of not more than $250,000, or twice the gross gain

caused by the offense, or twice the gross loss caused by the offense, whichever

Defendant's Initials  _AS_

is greater, a term of supervised release of not more than 3 years, and a special assessment of $100.

Counts Three and Four each carry a maximum sentence of 10 years' imprisonment, a fine of not more than $500,000, or twice the amount of the criminally derived property in the transaction, whichever is greater, a term of supervised release of not more than 3 years, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

3.   Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.  The elements of Counts One and Two are:

| First: | The defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises; |
|---|---|
| Second: | The false pretenses, representations, or promises were about a material fact; |
| Third: | The defendant acted with the intent to defraud; and |

Defendant's Initials           2

| | |
|---|---|
| Fourth: | The defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme. |

The elements of Counts Three and Four are:

| | |
|---|---|
| First: | The defendant knowingly engaged or attempted to engage in a monetary transaction; |
| Second: | The defendant knew the transaction involved property or funds that were the proceeds of some criminal activity; |
| Third: | The property had a value of more than $10,000; |
| Fourth: | The property was in fact proceeds of wire fraud; and |
| Fifth: | The transaction took place in the United States. |

4.    Indictment Waiver

Defendant will waive the right to be charged by way of

Indictment before a federal grand jury.

5.    No Further Charges

If the Court accepts this plea agreement, the United States

Attorney's Office for the Middle District of Florida agrees not to charge

defendant with committing any other federal criminal offenses known to the

Defendant's Initials _JS_              3

United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.    Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. §§ 3663(a) and (b) and 3663A(a) and (b), the defendant agrees to make full restitution to each and every victim (as that term is defined in 18 U.S.C.§ 3663A(a)(2)) who invested with the defendant and/or Highrise Advantage, LLC, either directly or through a Feeder Pool, including, but not limited to, Green Knight Investment, King Royalty Inc, SR&B Investments, Bull Run Advantage, Advance Green, Northbrook Progressive Investment LLC, Netstat Enterprises, Bromell Investment/ Thirteen Twenty Two Investments, Lall Team Investments, Coastal Waters, and Buckingham Investment Enterprise.  The amount of restitution shall be in the amount determined by the Probation Office.  The defendant agrees and acknowledges that, as of the date of this plea agreement, the parties estimate that the amount of restitution in this case is at least $27,835,022.78, which represents an estimate of the total amount that the defendant obtained, through the wire fraud, from victims.  The defendant agrees and acknowledges that the amount of restitution to be paid is an approximate amount and that the amount of total restitution and the number of victims may be higher at the time of sentencing.

Defendant's Initials _A S_                4

7.   Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement.  The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8.   Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a).  The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant

Defendant's Initials _A S_            5

complies with the provisions of USSG §3E1.1(b) and all terms of this plea

agreement, including, but not limited to, the timely submission of the financial

affidavit referenced in Paragraph B.5., the United States agrees to file a motion

pursuant to USSG §3E1.1(b) for a downward adjustment of one additional

level.  The defendant understands that the determination as to whether the

defendant has qualified for a downward adjustment of a third level for

acceptance of responsibility rests solely with the United States Attorney for the

Middle District of Florida, and the defendant agrees that the defendant cannot

and will not challenge that determination, whether by appeal, collateral attack,

or otherwise.

> 9.    Cooperation - Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the

investigation and prosecution of other persons, and to testify, subject to a

prosecution for perjury or making a false statement, fully and truthfully before

any federal court proceeding or federal grand jury in connection with the

charges in this case and other matters, such cooperation to further include a

full and complete disclosure of all relevant information, including production

of any and all books, papers, documents, and other objects in defendant's

possession or control, and to be reasonably available for interviews which the

United States may require.  If the cooperation is completed prior to

Defendant's Initials  *A S*          6

sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

10.    Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the

Defendant's Initials _AS_            7

course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

    11.    Cooperation - Responsibilities of Parties

    a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

    b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

Defendant's Initials _AS_        8

(1)     The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)     The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the

defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

   (3) The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

   (4) The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

   (5) The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

Defendant's Initials _A S_   10

12.   Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately
and voluntarily any and all assets and property, or portions thereof, subject to
forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28 U.S.C. §
2461(c), whether in the possession or control of the United States, the
defendant, or defendant's nominees.  The assets to be forfeited specifically
include, but are not limited to, the following:  the $57 million in proceeds the
defendant admits he obtained as the result of the commission of the offenses to
which the defendant is pleading guilty, as well as: the real property located at
9070 Mayfair Pointe Drive, Orlando, FL 32827, which asset was purchased
with proceeds of the wire fraud scheme and involved in the money laundering
offense charged in Count Four of the Indictment to which the defendant is to
plead guilty.  The net proceeds from the forfeiture and sale of any specific
asset(s) will be credited to and reduce the amount the United States shall be
entitled to forfeit as substitute assets pursuant to 21 U.S.C. § 853(p).

The defendant acknowledges and agrees that (1) the defendant
obtained $57 million as a result of the commission of the wire fraud offenses
and (2) as a result of the acts and omissions of the defendant, the proceeds not
recovered by the United States through the forfeiture of the directly traceable
assets listed herein have been transferred to third parties and cannot be located

Defendant's Initials _AS_          11

by the United States upon the exercise of due diligence.  Therefore, the

defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is

entitled to forfeit any other property of the defendant (substitute assets), up to

the amount of proceeds the defendant obtained, as the result of the offense(s)

of conviction and, further, the defendant consents to, and agrees not to

oppose, any motion for substitute assets filed by the United States up to the

amount of proceeds obtained from commission of the offense(s) and consents

to the entry of the forfeiture order into the Treasury Offset Program.

      The defendant additionally agrees that since the criminal

proceeds have been transferred to third parties and cannot be located by the

United States upon the exercise of due diligence, the preliminary and final

orders of forfeiture should authorize the United States Attorney's Office to

conduct discovery (including depositions, interrogatories, requests for

production of documents, and the issuance of subpoenas), pursuant to Rule

32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate,

and forfeit substitute assets.

      The Defendant expressly consents to the forfeiture of substitute

assets.  The defendant agrees that forfeiture of substitute assets as authorized

herein shall not be deemed an alteration of the defendant's sentence and the

Defendant's Initials _$AS$_      12

United States shall not be limited to the forfeiture of the substitute assets, if any, specifically listed in this plea agreement.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government.  Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

Defendant's Initials _A S_          13

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture (including substitute assets) and to transfer custody of such property to the United States before the defendant's sentencing.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.  The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to,

Defendant's Initials _AS_                14

the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

Defendant's Initials _AS_          15

B.  **Standard Terms and Conditions**

    1.    Restitution, Special Assessment and Fine

        The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

        On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.  To ensure that this obligation is satisfied, the defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount

Defendant's Initials __*AS*__      16

of $400, payable to "Clerk, U.S. District Court" within ten days of the change
of plea hearing.  The defendant understands that this agreement imposes no
limitation as to fine.

    2.    Supervised Release

    The defendant understands that the offenses to which the
defendant is pleading provide for imposition of a term of supervised release
upon release from imprisonment, and that, if the defendant should violate the
conditions of release, the defendant would be subject to a further term of
imprisonment.

    3.    Immigration Consequences of Pleading Guilty

    The defendant has been advised and understands that, upon
conviction, a defendant who is not a United States citizen may be removed
from the United States, denied citizenship, and denied admission to the
United States in the future.

    4.    Sentencing Information

    The United States reserves its right and obligation to report to the
Court and the United States Probation Office all information concerning the
background, character, and conduct of the defendant, to provide relevant
factual information, including the totality of the defendant's criminal activities,
if any, not limited to the counts to which defendant pleads, to respond to

Defendant's Initials _A.S._    17

comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

     5.    <u>Financial Disclosures</u>

         Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this plea agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state,

Defendant's Initials  *AS*       18

and local tax returns, bank records and any other financial information

concerning the defendant, for the purpose of making any recommendations to

the Court and for collecting any assessments, fines, restitution, or forfeiture

ordered by the Court.  The defendant expressly authorizes the United States

Attorney's Office to obtain current credit reports in order to evaluate the

defendant's ability to satisfy any financial obligation imposed by the Court.

      6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to

nor bound by this agreement.  The Court may accept or reject the agreement,

or defer a decision until it has had an opportunity to consider the presentence

report prepared by the United States Probation Office.  The defendant

understands and acknowledges that, although the parties are permitted to

make recommendations and present arguments to the Court, the sentence will

be determined solely by the Court, with the assistance of the United States

Probation Office.  Defendant further understands and acknowledges that any

discussions between defendant or defendant's attorney and the attorney or

other agents for the government regarding any recommendations by the

government are not binding on the Court and that, should any

recommendations be rejected, defendant will not be permitted to withdraw

defendant's plea pursuant to this plea agreement.  The government expressly

Defendant's Initials ___ _A_S___        19

reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and

Defendant's Initials _AS_            20

cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the

Defendant's Initials _AS_          21

right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials _A S_         22

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ___21___ day of December, 2020.

MARIA CHAPA LOPEZ
United States Attorney

AVINASH SINGH
Defendant

Roger B. Handberg
Assistant United States Attorney

Michael Salnick, Esquire
Attorney for Defendant

Josephine Thomas
Assistant United States Attorney
Chief, Criminal Division

Defendant's Initials _A S_          23

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 6:20-cr-

AVINASH SINGH

## PERSONALIZATION OF ELEMENTS

### Counts One and Two, 18 U.S.C. § 1343

1.  From in or about February 2013 through September 2020, did you knowingly devise or participate in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises?

2.  Did you know that the false pretenses, representations, or promises were about a material fact?

3.  Did you act with the intent to defraud?

4.  Did you transmit or cause to be transmitted by wire some communication in interstate commerce to help carry out the scheme? In particular, did you send emails to P.C. on or about April 28, 2017 and July 30, 2019 that falsely represented that Highrise made a profit on forex trading for the months of April 2017 and July 2019?

### Counts Three and Four, 18 U.S.C. § 1957

1.  Did you knowingly engage or attempt to engage in two monetary transactions, namely, a transfer on April 25, 2018 of $65,230.52 by and through JPMorgan Chase Bank to pay an American Express credit card bill, and a transfer on September 4, 2020 of $920,598.65 by and through Wells Fargo Bank for the down payment on a residence located at 9070 Mayfair Pointe Rd, Orlando, FL 32827?

Defendant's Initials _A S_          24

2.      Did you know that the transactions involved property or funds that were the proceeds of some criminal activity?

3.      Did the properties have a value of more than $10,000?

4.      Were the properties in fact proceeds of wire fraud?

5.      Did the transactions take place in the United States?

Defendant's Initials _A̶S̶_          25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 6:20-cr-

AVINASH SINGH

## FACTUAL BASIS

### **Overview**

Beginning in or around February 2013 and continuing to September 2020, Avinash Singh solicited and accepted at least $57 million from at least 1,100 participants ("pool participants"), in connection with pooled investments in retail foreign currency contracts ("forex") through a company controlled by him by the name of Highrise Advantage, LLC ("Highrise"). Pool participants deposited funds directly into the Highrise master commodity pool ("Master Pool") or into "feeder" pools that funneled some of the deposits they received to the Master Pool (the "Feeder Pools"). Rather than use all of pool participants' funds to trade forex in the Master Pool as Singh had promised he would do, Singh traded only a small portion and instead misappropriated over $50 million of pool participants' funds to pay for personal expenses and to make Ponzi-type payments to other pool participants, including Feeder Pool entities.

Defendant's Initials _AS_        26

Because Highrise solicited funds for the purpose of trading forex in pooled accounts, it acted as a commodity pool operator ("CPO") while operating a commodity pool in its own name. At no time was Highrise registered with the Commodity Futures Trading Commission ("CFTC") as a CPO. Singh acted as an Associated Person of the CPO by soliciting participation in his respective commodity pool. Singh was not registered as an Associated Person of his CPO, Highrise.

As part of the fraudulent scheme, Singh issued monthly account statements to pool participants that directly invested with Highrise as well as to the pool participants of some of the Feeder Pools. Singh's monthly statements misrepresented the profits and balances of the pool participants' respective interests in the Master Pool.

In summary, Singh devised and executed a scheme to defraud victims based upon a series of false representations made by him relating to material facts, including:

- Singh falsely claimed to have a proven track record of success as a forex trader;

- Singh falsely represented that he would use the funds provided to him and Highrise for investments in forex;

- Singh falsely represented that Highrise would "guarantee" that victims would not lose any funds for any trading losses;

Defendant's Initials _A S_        27

- Singh provided false monthly account statements that represented that the investments made by Singh and Highrise were profitable and that Singh had invested the victims' funds as he had promised to do;

- Singh failed to disclose to his victims that he was running his investment fraud scheme as a Ponzi scheme by which he used funds from new investors to pay amounts owed or requested by other investors;

- Singh failed to disclose to his victims that he used millions of dollars of their investments to benefit himself as opposed to investing the funds as he had claimed to do.

The total amount of loss caused by Singh's scheme for purposes of the federal sentencing guidelines is at least $27,835,022.78. The parties agree and acknowledge that this amount of loss is consistent with the principles set forth in USSG §2B1.1 app. note 3(F)(iv) in that it reflects no reduction in loss for funds transferred to any individual investor in the scheme in excess of that investor's principal investment (*i.e.*, the gain to an individual investor in the scheme was not used to offset the loss to another individual investor in the scheme). The defendant also agrees and acknowledges that the loss amount in this case may be higher as victims provide their victim impact statements to the Court and the Probation Office, additional victims are identified, victims who invested through Feeder Pools provide their victim impact statements and requests for restitution to the Court and the Probation Office, or other

Defendant's Initials _A S_          28

information is obtained that impacts the loss and restitution amounts in this case.

The defendant also agrees and acknowledges that his conduct constituted sophisticated means for purposes of application of USSG §2B1.1(b)(10) and that his offense resulted in loss by 10 or more victims for purposes of application of USSG §2B1.1(b)(2)(A). By engaging in this conduct and the conduct further described herein, Singh engaged in acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2018), and accompanying CFTC regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2019).

### Overview of Singh and Highrise

At all times relevant to this case, Highrise was a Florida limited liability company with its business address in Orlando, Florida. Highrise's articles of organization were filed with the State of Florida on or about February 13, 2013. Highrise was never registered with the CFTC in any capacity.

Singh was the founder, registered agent, principal member, and manager of Highrise. At all times relevant to this case, Singh was a resident of Osceola County in the Middle District of Florida. Singh opened at least 12 bank accounts in Highrise's name, in at least seven different financial institutions, and was the sole signatory on the bank and trading accounts in

Defendant's Initials  *AS*          29

the name of Highrise.  Singh has never been registered with the CFTC in any

capacity.

### Overview of the "Master Fund"

As devised and executed by Singh, Highrise served as a "master fund"

entity in a "master-feeder" fund structure.  As the "master" fund, Singh and

Highrise solicited money directly from pool participants and through feeder

funds to trade forex.

Singh solicited some investors, over 1,000, to invest directly in

Highrise's "Master Pool."  Singh solicited "Feeder Pools" for other investors.

In general, a "Feeder Pool" was an entity that solicited its own investors and

then invested some portion of its funds with Singh and Highrise.  In advising

their investors as to Singh and Highrise, the Feeder Pools sometimes would

pass along information that was received from Singh about Highrise and its

alleged performance in forex trading.  Singh and Highrise received

investments from Feeder Pools who invested funds with Singh and Highrise

on behalf of hundreds of victims (in addition to the over 1,000 who invested

directly with Highrise).  To date, investigators have identified the following

Feeder Pools: Green Knight Investment, King Royalty Inc., SR&B

Investments, Bull Run Advantage, Advance Green, Northbrook Progressive

Investment LLC, Netstat Enterprises, Bromell Investment/ Thirteen Twenty

Defendant's Initials _AS_        30

Two Investments, Lall Team Investments, Coastal Waters, and Buckingham Investment Enterprise.

The end result of Singh's fraud scheme was that victims deposited funds directly into Highrise's "Master Pool" or indirectly through one of the Feeder Pools, which deposited participant funds in Highrise. Singh pooled the funds together, and commingled the pool participant funds with other non-pool participant funds. Singh then transferred a small portion of the pool participants' funds into forex trading accounts in Highrise's own name. Singh used most of the funds to operate Highrise as a Ponzi scheme and to take funds for his own personal benefit.

### Execution of the Scheme

Beginning on or around February 2013 and continuing to September 2020, Singh solicited pool participants to invest in forex trading, either directly with Highrise or through a Feeder Pool. For investors who provided funds through a Feeder Pool, Singh knew that many of those investors relied upon the information that he provided about himself and his claimed intention to trade the funds in forex to earn large returns for his investors.

In his solicitations, Singh marketed himself as a successful trader. As early as 2013, Singh claimed to be a professional trader with over 10 years of forex trading experience. Singh told a prospective pool participant that he was

Defendant's Initials _AS_         31

a commodity trader, had several pools and investors, and falsely, that those investments were low risk and had a track record of positive gains with no loss. As Singh knew when he made those representations, they were false. Singh did not have 10 years of forex trading experience, and he did not have a track record of positive gains with no loss. Singh's investors relied upon Singh's false representations about himself and his success as a forex trader and provided Singh and Highrise with over $57 million to invest in forex.

Singh memorialized some of his false representations in the contracts that he requested that some pool participants sign with Highrise, and Singh used those contracts to induce victims into believing his misrepresentations as to how he would use the victims' funds. In some of those contracts, Singh falsely represented to victims that their "invested funds [would] start to trade on FOREX on the next trading day" and that their "invested funds would be traded on FOREX only." Singh also used those contracts to advise victims that they were required to pay to Highrise a fee of 50% of the individual pool participant's purported profit per positive trading month for reimbursement of Highrise's ordinary administrative expenses and that investors were guaranteed not to lose any money ("In case of negative trading results no profit is paid, however no trading loss is deducted from Client's investment deposit, as covered by the Company's guarantee.").

Defendant's Initials *AS*              32

Singh instructed pool participants to write checks or wire funds directly to bank accounts in the name of Highrise, which Singh controlled, where pool participant funds were pooled and commingled. Singh and Highrise received at least $57,224,083 to trade in forex. Rather than trade all pool participant funds as Singh had promised, Singh ran Highrise as a Ponzi scheme by which Singh used funds from one investor to pay an amount owed to another investor. Singh did not invest the funds that he promised to invest, but misappropriated at least $45,354,910 in the form of Ponzi payments to other investors and over $10 million in personal expenses. Singh's personal expenses included payments for travel, car costs, professional services, retail purchases, phone bills, marketing, home and personal costs, events, dining, and other miscellaneous expenses.

In other words, Singh invested in forex less than 5% of the over $57 million that he received from his victims. To date, investigators have identified the following brokerage accounts where Singh or Highrise had funds (approximate amounts invested by Singh with those brokers is indicated):

- Oanda -- $657,000
- Vantage -- $508,763.41
- Tallinex -- $631,000

Investigators have reviewed Highrise's bank accounts and customer documents. From that review, investigators have determined that the amount of investor funds that was provided to Highrise is at least $57,224,083. Of that amount, the vast majority (at least $45,354,910) went out in payments to investors as part of Singh's plan to lull investors into believing that he and Highrise were earning the trading profits that were represented on the account statements. Some investors received more in payments than they invested. Others received less. For example, one investor invested $2,000 and received $21,118.87 in payments, while another investor invested $30,000 and lost $15,093.22. The end result was that many investors lost significant sums of the principal that they invested. The total amount of principal lost by investors as a result of Singh and his scheme is at least $27,835,022.78, which represents the loss in this case for purposes of the federal sentencing guidelines. The defendant agrees and acknowledges that the loss amount in this case may be higher for the reasons set out above.

In order to conceal his fraudulent scheme, to lull his victims into a false sense of security as to the safety and profitability of their investments, and to induce other victims to invest with him and Highrise, Singh issued monthly account statements that falsely represented that Singh had invested the funds in forex as he had promised to do and that he was making large profits. In

Defendant's Initials _*AS*_        34

fact, Singh's investments, when he made them, often lost significant sums of funds, which led Singh into creating false monthly statements that falsely represented that the investments had made money, which, as Singh knew, was not true.

For example, one of Singh's victims, P.C., invested a total of $85,000 ("Victim Investor"). Singh told the Victim Investor that because of Singh's trading experience, commodity trading was a low-risk investment, with positive returns and little to no losses. On or about February 7, 2017, Singh emailed the Victim Investor with a contract to sign in which Singh promised that "invested funds start to trade on FOREX on the next trading day," that "invested funds are traded on FOREX only," and that "no trading loss is deducted from Client's investment deposit, as covered by the Company's guarantee" in the event of negative trading results for a month.

In reliance upon these false representations, the Victim Investor provided Singh with an initial investment of $45,000 on February 28, 2017. From February 2017 through August 2019, Singh emailed monthly account statements to the Victim's Investor. Singh knew that those monthly statements contained false information. For example, on or about April 28, 2017, Singh emailed the Victim Investor a monthly statement for April 2017, which represented that the investment yielded a "profit" of $3,098 that was

Defendant's Initials _AS_       35

credited to the Victim Investor's account. In fact, Highrise's accounts at Oanda for that month experienced a net loss of $545.43. Singh lied about the amount of money that he made for that month to convince the Victim Investor to keep his money with Highrise and to induce the Victim Investor into investing more funds. Singh was located in the Middle District of Florida when he sent the April 28, 2017 email, and it was received by the Victim Investor in the Middle District of Florida **(Count One)**. The email traveled in interstate commerce, because it was processed by a server located outside of Florida.

Singh's plan worked. On or about April 28, 2017, the Victim Investor provided $40,000 to Singh and Highrise for further investments in forex. Singh continued to supply the Victim Investor with false monthly statements that falsely represented that the Victim Investor's funds were invested in forex and that the Victim Investor's funds were making money. In fact, Singh's investments at Oanda lost money almost half of the time, which is contrary to what Singh told the Victim Investor in the monthly statements (instances where the Victim Investor was told that their profits were greater than what was actually received in Highrise's Oanda accounts are highlighted in yellow):

Defendant's Initials _A.S_      36

| Date | Victim Investor | Oanda |
|------|-----------------|-------|
| March 2017 | $2,195 | $3,803.33 |
| April 2017 | $3,098 | -$545.43 |
| May 2017 | $4,505.62 | $721.10 |
| June 2017 | $4,112 | -$17.43 |
| July 2017 | $4,386.74 | -$4,102.29 |
| August 2017 | $4,332.13 | $6,990.53 |
| September 2017 | $4,168.96 | $49,141.69 |
| October 2017 | $4,455.36 | $12,260.27 |
| November 2017 | $4,291.91 | -$5,682.03 |
| December 2017 | $4,800.17 | $9.737.56 |
| January 2018 | $4,895.79 | -$588.50 |
| February 2018 | $3,011.00 | -$85.49 |
| March 2018 | $4,109.00 | -$12,204.77 |
| April 2018 | $4,790.98 | $4,461.66 |
| May 2018 | $4,834.39 | $13,859.83 |
| June 2018 | $13,859.83 | $22,372.36 |
| July 2018 | $4,737.62 | $997.37 |
| August 2018 | $4,801.00 | -$65,696.34 |
| September 2018 | $4,765.00 | -$3,996.71 |

Defendant's Initials _AS_        37

| October 2018 | $4,799.00 | -$8,658.67 |
|---|---|---|
| November 2018 | $5,024.18 | -$9,915.96 |
| December 2018 | $4,902.00 | -$449.07 |
| January 2019 | $5,122.00 | $16,328.69 |
| February 2019 | $5,264.89 | $9,061.84 |
| March 2019 | $5,164.55 | $1,621.65 |
| April 2019 | $4,988.00 | $14,404.81 |
| May 2019 | $5,153.06 | $17,013.74 |
| June 2019 | $4,705.97 | $8,435.20 |
| July 2019 | $4,796.00 | -$12,705.58 |
| August 2019 | $4,955.00 | $24,928.37 |

The Victim Investor was not the only one who received Singh's false monthly statements. A review of account statements for other victims establishes that Singh made up the profit numbers on the monthly statements, as there is no consistency in the numbers between investors and the numbers bear no relation to the amount actually in the trading accounts belonging to Highrise. For example, Singh reported a profit to the Victim Investor of $4,796 (on an $85,000 total investment) in July 2019, while Singh reported a profit to an account for a Feeder Pool ("Feeder Pool 1") of $112,611 (on a $400,000 total investment). A proportionate profit for the Victim Investor

Defendant's Initials _AS_         38

should have been approximately $18,000 if the Victim Investor was receiving

the same profit as Feeder Pool 1, or Feeder Pool 1 should have received

approximately $22,000 if Feeder Pool 1 was receiving the same profit as the

Victim Investor.  Neither of those investors, however, should have received

any profit for July 2019, because Highrise lost money that month in its Oanda

account.  Singh falsified the numbers to both investors to deceive the Victim

Investor and the investors of Feeder Pool 1 into believing that their

investments were making money when they were not for that month.  Singh

emailed that false monthly statement from the Middle District of Florida to

the Victim Investor's email account on or about July 30, 2019, which traveled

in interstate commerce because it was processed by a server located outside of

Florida (**Count Two**).

  With respect to the Feeder Pools, Singh knew that some of the Feeder

Pools would advise its investors of the profits that Singh claimed Highrise had

made on their investments and that the investors in those Feeder Pools would

rely upon those representations in maintaining their investments and making

new ones with the Feeder Pools.  For example, Feeder Pool 1 took the profit

information provided by Singh and used that information to prepare monthly

statements for Feeder Pool 1's investors.  Because Feeder Pool 1 used the

information supplied by Singh, the monthly statements provided by Feeder

Defendant's Initials _AS_          39

Pool 1 contained false information about the profits received from forex investing. Singh knew that many of the Feeder Pools were disseminating to their investors the false information that Singh had providing to the Feeder Pools. In effect, Singh's false representations about the profitability of his forex investments went to over 1,100 victims, either directly or through information provided to the Feeder Pools that was disseminated to the investors.

Singh marketed his forex investments to individuals who he knew were investing their retirement funds. At least 40 investors transferred retirement funds to Singh and Highrise during the execution of Singh's scheme.

### Failure to Register

Singh acted as the CPO for Highrise, because he solicited and accepted funds from pool participants for the purpose of pooling the funds in commodity pools. On or about September 2, 2014, Singh filed a notice of exemption with the National Futures Association (NFA) on behalf of Highrise claiming it was exempt from the requirement to register as a CPO pursuant to CFTC Regulation 4.13 (a)(2), 17 C.F.R. § 4.13(a)(2) (2019). This self-executing exemption remained in effect after that date. By filing for the exemption pursuant to CFTC Regulation 4.13(a)(2), Singh affirmed that none of the pools operated by him or Highrise had more than 15 participants at any

time and that the total gross capital contributions the pool received for units of

participation in all of the pools it operated or that it intended to operate did

not in the aggregate exceed $400,000. As Singh knew when he filed that

notice, it was false. Highrise had collected well in excess of $400,000 in gross

capital contributions by September 20, 2016. Because Highrise did not fit both

of the requirements of CFTC Rule 4.13(a)(2), Highrise was not eligible for the

exemption that it claimed under 17 C.F.R. § 4.13(a)(2) (2019) and, therefore,

should have been registered as a CPO no later than September 20, 2016.

Singh lied in filing his exemption and did not register as part of his effort to

avoid detection of his scheme to regulators.

### Money Laundering

Singh committed his wire fraud scheme to benefit himself financially.

During the execution of his scheme, Singh took over $10 million of his

victims' funds for his own use. Singh diverted those funds to himself as

opposed to investing them, which was contrary to his promises to his victims.

Singh also took those funds, even in months when he lost money in forex

trading.

Singh used some of the funds obtained from his fraud scheme to

purchase a residence, vehicles, and for millions of dollars in personal

spending, which he paid using funds obtained from his wire fraud scheme.

Defendant's Initials _AS_ 41

For example, on April 25, 2018, Singh used the Highrise Advantage bank account at JPMorgan Chase Bank, Acct #3730, in the Middle District of Florida to pay $65,230.52 to American Express **(Count Three)**. To make that payment, Singh used some of the $100,000 in investor funds that were received in Highrise Advantage bank account at JPMorgan Chase Bank, Acct #3730, that week. Singh knew that the funds that he was using to make the $65,230.52 American Express payment were funds that he obtained from his wire fraud scheme. The American Express charges that Singh paid with those investor funds included payments for cruise fare and onboard ship services, plane tickets to Chicago, Orlando Music production costs, groceries, Amazon orders, dining out, and cell phone, cable and electric bills. Some of the American Express bill also was for PayPal payments that Singh made to investors to prolong his scheme.

A second example of Singh's use of wire fraud funds for his personal spending involved his purchase of his personal residence located at 9070 Mayfair Pointe Rd, Orlando, FL 32827. On or about September 4, 2020, Singh sent a wire transfer in the amount of $920,598.65 from his personal bank account at Wells Fargo Bank, Acct. # 8402, to the settlement agent for the property closing **(Count Four)**. Prior to making that wire transfer, the account at Wells Fargo, Acct #8402, was funded by transfers of investor funds

Defendant's Initials  *AS*          42

from a Wells Fargo Bank account for Highrise, Acct #8410, which Singh knew were proceeds that were obtained from execution of his wire fraud scheme. The $920,598.65 wire transfer represented the down payment for Singh's personal residence. At all times relevant to this case, the accounts and deposits of JPMorgan Chase Bank and Wells Fargo Bank were federally insured by the Federal Deposit Insurance Corporation.

Because of the amount of funds that he took for himself and the fact that his forex trades often lost money, Singh had to take out lines of credit from different banks to keep his scheme afloat. For example, between April 2016 and November 2019, Singh had a line of credit at Kabbage, Inc., from which Singh received $447,500 into his business bank accounts. Similarly, between November 2017 and July 2019, Singh had a line of credit at National Funding, from which Singh received $429,627 into his business bank accounts.

Defendant's Initials $\textit{AS}$          43